IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

DANA A. WEBB, SR. and
MAIDA D. WEBB, his wife,

      Plaintiffs,

v.            CIVIL ACTION NO. 3:19-0883

KANAWHA RIVER TERMINALS, LLC,
a limited liability company, in its own right and
as owner or owner *pro hac vice* of the M/V
Dorothy L and M/V A.S. Maynard and a fleet
of barges and 3 work barges,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

  Pending before the Court is Defendant Kanawha River Terminals, LLC's ("KRT") Motion for Summary Judgment (ECF No. 33). For the reasons herein, the Motion is **GRANTED**.

**I. FACTUAL BACKGROUND**

  This action arises from Plaintiff Dana A. Webb, Sr.'s accident on December 29, 2016. Plaintiff worked as an off-loader operator for Defendant. *See* Employer's Report of Injury, ECF No. 33-1. At his job, he fell while traversing a steel walkway that was part of an off-loader barge at Defendant's terminal facility in Ceredo, West Virginia. *See id.* After the injury, pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), Defendant paid workers' compensation benefits through its insurer. *See* Notice of Payments, ECF No. 33-2. Plaintiff continues to pursue an administrative claim for benefits under the LHWCA.

  Certain facts regarding the off-loader barge are undisputed. It was originally constructed

in 1971 as a crane barge and modified in 1996. Tiller Aff. ¶ 11, ECF No. 33-3. KRT purchased the barge in 2005 to serve as an off-loading dock in a larger off-loading site, to save money on trucking costs. *Id.* ¶¶ 8, 11. The barge was extensively modified for this purpose, with Plaintiff assisting in the modification of the barge. *Id*. ¶¶ 11, 13; Pl.'s Aff. ¶ 3, ECF No. 38-1. For example, a hydraulic excavator was anchored to it, a landside hopper and belt structure were secured to it, and a 4,000-gallon diesel fuel tank was mounted and secured to it to fuel the excavator. Tiller Aff. ¶¶ 11, 13; Pl.'s Depo. 48-50, ECF No. 33-4. The barge also had a walkway from landside, a break room building, a greasing station, and fixed lights fed by electrical cables connected landside. Tiller Aff. ¶ 13; *See* Pl.'s Depo. 48-54, 59-64. Further, it is undisputed that, if the off-loader barge was detached from its moorings, it could not independently function. *See* Pl.'s Depo. 58. If disconnected, the off-loader barge was not self-propelled or otherwise capable of moving without the assistance of another marine vessel, such as a tugboat. Tiller Aff. ¶ 17; Good Aff. ¶¶ 11, 12, ECF No. 38-2.

Parties agree that the barge was secured by specialized moorings which allowed it to rise and lower with the tide. *See* Pl.'s Depo. 53-55; Tiller Aff. ¶ 9. What is disputed, however, is the exact way the off-loader barge was connected to the shore and the ease with which the off-loader barge could be detached from its moorings. Plaintiff asserts that the connections were mostly impermanent and easily removed, meaning the barge could be readied to navigate water with relative ease. *See* Pl.'s Aff. ¶¶ 10-11. On the other hand, Defendant argues that the moorings were more permanently affixed and could only be detached by an arduous and expensive process. *See* Tiller Aff. ¶¶ 9, 10, 14, 15. Further, there is a dispute over whether the off-loader barge was ever moved for maintenance. *See* Pl.'s Depo. 150-151; Tiller Aff. ¶ 16. But no other movement was alleged.

After the accident, Mr. Webb and his wife, Plaintiff Maida D. Webb, filed this action on December 10, 2019. *See* Compl., ECF No. 1. There are three tort claims remaining against Defendant: (1) negligence pursuant to 33 U.S.C. § 905(b); (2) maritime tort, and (3) loss of consortium. Defendant moved for summary judgment on all claims. The Motion is fully briefed and ripe for resolution.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

The LHWCA is a workers' compensation statute covering maritime workers who meet a two-

prong situs and status requirement. *See P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 73-74 (1979). The first prong requires that the injury occur on a maritime situs, defined as "the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.)" *See In re CSX Transp., Inc.*, 151 F.3d 164, 168 (4th Cir. 1998) (quoting 33 U.S.C. § 903(a)). The second prong is a "status requirement" that ensures the employee is a maritime worker. "[T]o satisfy the status test, the employee must be engaged in 'maritime employment,' defined to include 'any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker.'" *Id*. at 168-69 (quoting 33 U.S.C. § 902(3)). Parties do not dispute that Plaintiff meets both requirements of the LHWCA. *See* Def.'s Mem. at 12, ECF No. 34. Indeed, Plaintiff pursued and was paid workers' compensation benefits.

Like many other workers' compensation statutes, the LHWCA bars injured employees from suing their employers in tort. *See* 33 U.S.C. § 905(a). An exception to an employer's immunity under the LHWCA exists when the employer is also a vessel owner (a "dual-capacity employer") and is being sued only in its owner capacity under § 905(b). *See id*. § 905(b). In this context, Plaintiff can only recover on his negligence theory if the off-loader barge in the accident is a vessel and if his injuries were caused by Defendant in its capacity as vessel owner. *See id*; *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 531-32 (1983). Parties primarily dispute whether the barge is a vessel and thus whether Plaintiff can maintain his suit under this exception to the LHWCA.

A. Definition of Vessel

Vessel is undefined in the LHWCA. However, Congress provided a definition of vessel in §§

1 and 3 of the Revised Statutes of 1873: "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 This definition is applicable to the LHWCA. *See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489 (2005).

The Supreme Court has twice examined this definition of vessel. *See e.g., Stewart*, 543 U.S. 481 (2005); *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115 (2013). In *Stewart*, the Supreme Court considered whether a dredge was a vessel. *See* 543 U.S. 481. The dredge was a massive floating platform with a bucket which removed silt from the ocean floor and dumped it into scows floating alongside. *Id.* at 484. It had "certain characteristics common to seagoing vessels," such as a captain and crew, navigational lights, a ballast tank, and crew dining area. *Id.* However, it also had a limited means of self-propulsion, was moved long distances by tugboat, and moved by manipulating anchors and cables, usually only over short distances. *Id*. In concluding that a dredge was a "vessel," the Court looked to the contemporary understanding of vessel at the time the definition was promulgated. *Id*. at 490. It noted that a watercraft need not be used primarily as a means of transportation on water to qualify as a vessel, only that it be "used or capable of being used" as one. *Id*. at 495-497 (quoting 1 U.S.C. § 3). Specifically, the Court noted that "[t]he question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id*. at 496 (internal quotation marks omitted).

After several circuit courts began using the definition of "vessel" under *Stewart* quite broadly, the Supreme Court revisited the issue in *Lozman*, emphasizing that the focus should be on whether a watercraft's use as a means of transportation on water is practical, not merely theoretical. 568 U.S. at 120-27. The Eleventh Circuit had previously found that a floating home

was a vessel because it was "capable" of movement over water. *See City of Riviera Beach v. That Certain Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length*, 649 F.3d 1259, 1267-69 (11th Cir. 2011). Upon review of the Eleventh Circuit's decision, the Supreme Court delineated the test to determine whether a watercraft is a vessel: whether "a reasonable observer, looking to the [object's] physical characteristics and activities would consider it designed to a practical degree for carrying people or things on water." *Lozman*, 568 U.S. at 121. Courts should "avoid subjective elements, such as owner's intent," and should consider only "objective evidence of a waterborne transportation purpose." *Id.* at 128. Because a reasonable observer could not look to the floating home's characteristics and activities and consider it to be designed to transport people or things on water, it was not a vessel. *Id* at 118. Specifically, the home had no rudder or steering mechanism, an unraked hull, and a rectangular bottom ten inches below the water. *Id*. at 121-22. Further, it had no special capacity to generate or store electricity but could only obtain that utility through ongoing connections with the land. *Id*. It appeared like ordinary nonmaritime living quarters. *Id*. It could only be transported over water by tow. *Id.* It had no features to suggest a design to transport over water anything other than its own furnishings and related personal effects. *Id*. Thus, it was not a vessel.

      This Court has previously considered whether an off-loader barge owned by Defendant was a vessel. *Smith v. Kanawha River Terminals LLC*, 829 F. Supp. 2d 401 (S.D.W. Va. Nov. 4, 2011). In concluding that the off-loader barge was a vessel, the Court noted that the barge had no living quarters, had no means of self-propulsion, was accessed by a steel-framed walkway, was powered by electricity supplied via onshore power cable, and had been moored for 11 months. *Id*. at 406-07. The Court also noted that the barge was floating, rather than permanently anchored in the riverbed, and that it could be removed without great difficulty where necessary for

maintenance. *Id*. at 406. These facts remain mostly the same, besides the length of mooring, but there has been an intervening change in the law and subsequent development of facts which dictate a reconsideration of the evidence and its relevance.

### B. This off-loader barge is not a vessel.

When faced with the record evidence, it is apparent that a reasonable observer, looking to the structure's physical characteristics and activities, would not consider it designed to a practical degree to carry people or things over water. When making this determination, courts must examine the physical attributes and behavior of the structure. *Lozman*, 568 U.S. at 128. As discussed above, the barge was extensively modified and exclusively served as a loading dock. Primary purpose is not dispositive but is highly relevant. *See Lozman*, 568 U.S. at 125 (a difference in vessel status determination in two cases existed where "the dredge [in one case] was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat [in the other case] was not designed (to any practical degree) to serve a transportation function and did not do so."). Major heavy equipment was affixed to the barge to effectuate this purpose. It could not independently function or self-propel. *See id*. at 122 ("[A]lthough lack of self-propulsion is not dispositive, it may be a relevant physical characteristic.").

Plaintiff attempts to create genuine issues on certain facts about the barge. For example, Defendant's expert details the extent of the connections affixing the off-loader barge to land, which included a walkway, a conveyor belt, electrical cables, I-beams welded to the barge, and a hand-operated winch mounted to the end of the barge and secured to a 75-ton shackle. Tiller Aff. ¶ 14. Plaintiff does not dispute that the existence of the connections but argues that the transfer conveyor belt was not a permanent mount and could be moved with the company crane. Pl.'s Aff. ¶ 10. He also disputes that the I-beams were welded to the barge, and instead avers that they were merely

mounted to bolt roller frames. Pl.'s Aff. ¶ 11. Plaintiff's expert also disputes the ease with which the moorings could be removed. Good Aff. ¶¶ 9-10. Defendant's expert maintains that detaching the off-loader barge, because of these moorings, would entail a lengthy three-to-four-day process costing approximately $5,000-$6,000. Tiller Aff. ¶ 15. Plaintiff disputes these contentions in his affidavit, noting that many of the connections such as the I-beams, shackle, and electric components could be easily removed or disconnected, making the entire process relatively simple. Pl.'s Aff. ¶¶ 9-12. His expert notes that the off-loader barge can be detached from its moorings within a matter of hours, based on Plaintiff's contentions. Good Aff. ¶ 9.

Defendant's expert notes that the off-loader remained in place from roughly 2005 to 2018, when it was replaced with a new off-loader barge. Tiller Aff. ¶ 16. In his deposition and affidavit, however, Plaintiff specifically testifies that he remembers the barge being unmoored and moved to the other side of the river for maintenance at some point before its replacement. Pl.'s Aff. ¶ 5; Pl.'s Depo. 150-151. To be clear, Defendant does not dispute that the barge could be moved (supported by Defendant's recognition that the original off-loader barge was replaced with a new barge in 2018) but disputes the ease and frequency with which it could be moved and whether it was ever moved before the replacement.

However, even when the Court takes Plaintiff's evidence as true, the same is insufficient to support a finding that the off-loader barge is a vessel. The record establishes that the off-loader barge was extensively connected to land by a variety of devices, many of which were permanent, and its removal would take at least some significant effort and time. *See Lozman*, 568 U.S. at 124 (noting that permanent attachment to land is relevant but not dispositive in the vessel inquiry). Further, it appears the barge was moved, at most, twice in a thirteen-year period and was never otherwise moved across the waterway. *See Lozman*, 568 U.S. at 122 (noting that infrequent travel

was important in determining vessel status and finding the house in question was not a vessel, in part, because it had only been moved four occasions over seven years).

District courts looking at the issue have analyzed similar factors to conclude that watercrafts are not vessels. In *Fireman's Fund*, the district court held that a drydock was not a vessel where it lacked self-propulsion; had no rudder or steering mechanism; lacked navigational lights, lifeboats, a wheelhouse, or other equipment for the transportation of passengers; was never used to transport cargo or people; and was more or less permanently moored, except for biannual dredging and two longer trips. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, No. 10-1653, 2013 WL 311084, at * 3-5 (S.D.N.Y. Jan. 25, 2013). Similarly, courts have held that floating restaurants were not vessels where they had no propulsion or steering mechanism, were moved infrequently, and were dependent on shoreside connections for utilities. *See Hosea Proj. Movers, LLC v. Waterfront Assocs., Inc.,* No. 1:15-799, 2018 WL 4566162, at *7 (S.D. Ohio Sept. 24, 2018), *report and recommendation adopted*, No. 1:15-799, 2019 WL 1440282 (S.D. Ohio Mar. 31, 2019). Here, of course, the off-loader barge similarly had no means of self-propulsion, lacked many of the trappings for transportation of passengers or equipment, was moved infrequently, and was dependent on shoreside connections for utilities.

Further, other district courts have found that unloading docks such as the one in this case are not vessels. In a case dealing with a barge modified for use as an unloading dock, a district court found that the watercraft was not a vessel. *See e.g.*, *Thomas v. Riverfront Limestone, LLC*, No. 5:14-191, 2018 WL 1413342 (W.D. Ky. Mar. 1, 2018). Even where the plaintiffs could show certain elements of the structure that implied it was meant for transportation, like a raked bow, lack of permanent attachment to the shore or connection to onshore utilities, and quick detachment process, the court held that it was not a vessel. *Id*. at *4. This was true because the barge's purpose

was not to transport workers and equipment over water. *Id*. Similarly, where a company's work barges had been withdrawn from navigation and were used as a stationary dock, the district court concluded that they were not vessels. *See Young v. T.T. Barge Servs. Mile 237*, *LLC*, 290 F. Supp. 3d 562, 567 (E.D. La. 2017). It reached its conclusion by finding that the work barges had no means of self-propulsion, could not generate their own energy, had been moved only a few times in recent years, and were secured to shore by a permanent walkway, steel cables, and electricity lines. *See id*; *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d. 239 (2d Cir. 2014) (finding that a dock connected by pilings to the harbor floor and permanently situated in its existing location cannot be a vessel for admiralty jurisdiction purposes); *Daniel v. Ergon, Inc.*, 892 F.2d 403, 407 (5th Cir. 1990) (noting, even pre-*Stewar*t, that there are three factors common to floating platforms that are not considered vessels, including that they were constructed and used primarily as work platforms, that they were moored or otherwise secured at the time of the accident, and that any transportation function they performed was merely incidental to their primary purpose of serving as work platforms). The same is true of the off-loader barge in question here. Because no reasonable observer would consider the off-loader barge to be designed to a practical degree for carrying people or things over water, it is not a vessel.

## IV. CONCLUSION

Accordingly, on the facts before this Court, the off-loader barge is not a vessel for the purposes of the exception to the LHWCA allowing dual-capacity suits against vessel owners. As such, Plaintiffs' claims are barred, and Defendant's Motion for Summary Judgment (ECF No. 33) is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

        ENTER:     March 21, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE